Hearing, hearing, hearing, this Honorable College Board of the 2nd District is now open for pursuant to adjournment. The Honorable Donald C. Hudson, presiding. Thank you. Please be seated. Your Honor, this is the second case in the morning called 213-0316, Blackhawk State Bank, et al. v. Excuse me, it's Martin Maggio v. Blackhawk State Bank. And on behalf of Mr. Maggio, the Honorable Chief Manning, on behalf of Blackhawk State Bank, Mr. Matthew Hedrick. Good morning. Counsel, I do want to make a statement this morning that I need to make. Justice Robert Spence is also a member of this panel. Obviously, you can tell one of the justices is not present. He was unable to be here this morning. However, he is, of course, a fully participating member of this panel. He will be able to listen to the oral arguments and does, of course, have the briefs and access to the record. And he will be participating in any decision that the court arrives at in this case. With those thoughts in mind, counsel for the appellant, you may proceed. Good morning. Good morning. May it please the court, my name is Donald Manning. I'm with the McGreevy Williams Law Firm in Rockford, Illinois. And I am here for Martin Maggio, the appellant. As is usually the case, I think both sides, and you know counsel well, have done our best to set forth our arguments in the briefs. So I just want to focus on the things that I think are the most critical. The main point of the whole case, in my view, centers around the question of whether Blackhawk State Bank actually got Holder in due course status. To me, that question also answers the question of who has the better claim or right to the proceeds under an unjust enrichment theory. I know that there was discussion back and forth in the briefs about whether Holder in due course status trumps an unjust enrichment claim, etc. But my point here, the main point is, no matter how the court addresses these facts, Blackhawk State Bank could not have been a Holder in due course. And I'd like to give the reasons why I think that's the case. Can you answer that threshold question that you yourself just alluded to? If the court were to find that Blackhawk was a Holder in due course, does that trump the unjust enrichment? Well, you know, I've given a lot of thought to that. And I would say that I'm not aware of any case in which the concepts of Holder in due course were applied to the third prong of the unjust enrichment theory, which is who has a better claim. In other words, I know that Douglas' case talks about Holder in due course status barring all claims, but that was not an unjust enrichment claim to my knowledge, as I recall. And so here you could have a situation where Blackhawk could technically meet the Holder in due course requirements. In other words, Your Honor could say or the trial court could have said, I suppose, the UCC provision on good faith was met. But on the other hand, let's say that the bank operated with honesty and fact, which is the measure of good faith, became a Holder in due course, you still have to answer the question in an unjust enrichment case. Regardless of, the unjust enrichment case does require misconduct on the part of the bank. That we know. And so the question still becomes. What's the evidence that showed that the bank unjustly retained the check or the proceeds? They credited towards, is it Bilkey's? Yeah, Allen Bilkey's. I think the evidence of that is that it was totally illusory. In other words, they made a credit, but the credit had no real impact on anybody. The only impact that credit had on, the person that it was Martin Maggio, who's $425,000. Assuming everything you say is true about that, how does the bank know this? Well, the bank. Bilkey was in the check, Mr. Maggio wasn't at the bank, was he? He was not at the bank. In fact, that's the problem as we see it. When Bilkey showed up with the check and it was suspicious on its face because it referenced the sale of the farm and that it was a down payment on it. What was the exact wording on the check? The check said payment on farm was $425,000 balance, $400,000 due. And so what happened was Bilkey brings that check to the bank after being threatened by the banker. You're going to be thrown into the vault because you sold an RV out of trust so others are missing. And Bilkey came in and gave that check to the banker. The banker looked at it and read it and then actually got on the phone and called Bilkey and said, wait a minute, you're supposed to be here paying off this RV. I've got a check from Maggio Truck Center that's talking about a farm. And then Bilkey, this is from the bank. Bilkey says what? Bilkey says, well, Martin Maggio is an old friend of mine. He's willing to help out. And my point of view under. And so the bank is supposed to do what then? The bank is supposed to call Maggio and do an investigation because that check on its face was suspicious. It was unusual. What case law do you cite that requires a bank to do that? The new Randolph case, which both sides cited and discussed in the brief. The new Randolph, that was a case where there were a series of checks made to a person who came to a currency exchange to cash them. One of the checks had a misspelling. It was suspicious for that reason and I think maybe one or two other reasons. The currency exchange there saw that check, looked at the history and said, well, we've cashed checks for this person before, but this is suspicious. So what did they do? They called the maker of the check. Well, in that case, the person they called was also part of the conspiracy, so they didn't get any relief. That's why the lawsuit ensued. But new Randolph and some Seventh Circuit cases and other state cases that it discussed talk about when you're faced with a check. And there are unusual or suspicious circumstances associated with it. And this clearly falls into that category. Then your obligation is not to just blindly accept what truthfully is a patently unbelievable story. Let's assume that the bank knew. Let's give your theory all the way to the efficacy you're entitled to. Let's assume the bank knew that Mr. Maggio was buying the property and this check was a down payment. What difference would that have made? Can't Bilkey sell his property? No, it makes a huge difference because here the bank had complete control via personal guarantees and cross-collateralization over all of Bilkey's property. And Maggio could not have purchased the property without getting out from under the bank's lead. And so what would have happened is... Well, they don't know what the purchase price was. Do they necessarily know what the purchase price was? Are you saying that Mr. Maggio could under no circumstances have bought Mr. Bilkey's property without the consent of the bank? That's what you're saying. He could have. He could have. And in fact ended up with a deed to it. But what he didn't get it pretty clear. What he got was a heavily leveraged piece of property that the bank was owed more than it was worth. Of course. Don't you have a mortgage on your house? Most people do, right? Unfortunately, I still do, yes. So if somebody brings in a check, okay, even if it's for the down payment of the house, why would that be suspicious to the bank? They apply it to the indebtedness. They go to a closing later. There's enough money to pay off the liens. You're saying the bank should have seen this check and said, oh, there's something fraudulent that must be going on here. Exactly. That's exactly what I'm saying because in the larger context of the situation, remember, Bilkey owed the bank $7 million. He was under threat of default. He had assets that were missing, multi-hundred thousand dollar recreational vehicles. So he says a friend is trying to help him out. Yeah. And I think that common sense and reasonableness, good conscious, you know, equity required the banker under new Randolph to pick up the phone and say to Mejio, hey, this guy is here saying that you're loaning him or giving him $425,000. Is that the case? And Mejio would say, no, I'm trying to buy that land from him and he told me that he's going to deliver a deed to me for you to clear your lien. And then the banker, if you were honest, would say, well, that's not what's going to happen. So you're saying every time somebody shows up at a bank with a third-party check, the banker is supposed to call the third party. No, I'm not. What I'm saying is there's a huge difference. What's the rule that you want us to announce then that would apply in all cases? The rule is the new Randolph rule. That was a series of checks. It wasn't the longstanding customer that had a bunch of collateralized assets with the currency change, was it? And they knew Bill for years. Exactly. That's part of my point. Well, the answer I would give to Your Honor is that when the bank, the rule of law would be if a banker under these kinds of facts, if it's a large check with suspicious language on it, is presented to him. What was suspicious about the language? It's in the context. When Bill Key says this is to pay off the RV and it's an old friend loaning me the money, why would the check ever say down payment on a farm? It doesn't add up. Those two things should excite a reasonable person to say, I better look into this. This doesn't add up. It doesn't make sense. Why would this guy, why would a family friend give him or loan him that money and yet on the check talk about paying for a farm? Any reasonable person would say, what is that? What does that mean? I better call the guy. And I think the case law is already established that if there's something in the context that excites a reasonable person to essentially try not to deliberately avoid knowing what he would know, I think that's the rule of law. If there's something in the facts that excites a reasonable person to further investigate whether the person trying to pass this check has the authority to do with the check that he says he's doing, then there's an obligation to call. These were the arguments you made to the trial court as well. And the trial court believed Mr. Larson credited his testimony and gave no weight at all to Bilkey's affidavit, correct? That's correct. And the truth is, and I'm trying to make this point clear, it doesn't matter to me. I didn't argue that Bilkey didn't lie to Larson, for example. I wasn't there. I say take Larson's testimony at face value, that that's what Alan Bilkey told him. Bilkey lied to your client? Yeah, he did. Well, he's the bad guy in all this. He is the bad guy, but that doesn't let the bank off the hook to help gain Maggio out of the money. The bottom line is when you look at that check. But the trial court credited Larson's testimony and believed that he acted reasonably. I guess the point I've made in my brief and what I would reiterate here is that it was clearly erroneous. You have to be careful about that because it's very difficult to win. Credibility issues go to the weight, go to the trial court to try or affect. I don't think you want to go down that road too far. But I don't want you to be distracted by the questions we're asking. One of your critical points was you do not believe the bank is a holder in due course. Why not? Essentially, I've already given you the reasons. But under New Randolph, if you're presented with a check under suspicious or unusual circumstances, such a kind of a paraphrase of it, if it indicates, failure to investigate indicates a deliberate desire to evade knowledge because of a belief or fear that investigation would disclose a vice in the transaction. That's the standard. And the rule of law under Randolph and the cases it relies on is that if you're faced with a check that's presented to you for payment, in this case, to be credited to an account, you have an obligation, if it's unusual or suspicious, to pick up the phone and call. That's what happened in New Randolph. They called. That's why they were a holder in due course. That's what happened in the Seventh Circuit case in New Randolph where it relies upon. They called. They were a holder in due course. Here, the banker chose to hide his head in the sand. That's what he did. And then they grabbed the $425,000. All he had to do was call. And if they called, and that's the concept of this Douglas v. Walms case, even though that's a bank payee case and it's a slightly different rule of law, the bottom line, though, is a quote from the Second District where they talk about, Larson could have called Mangio and it would not be fruitless. It would have probably averted the entire controversy. Because Mangio would have said, don't cash, no, don't cash that check. That's not for this purpose. I'm not an old family friend of Alan Bilkey. No way. Don't cash that check. Rip it up. I'm going to stop paying that. We wouldn't be here today. The only other point that I have to make with respect to the major points that we've hit on is the idea that What about if Bilkey went to some other place and not his bank and cashed the check? He could have gotten away with it. I think that's a different set of facts. You know, this is not a case where Bilkey went to the bank, took the check, took a deposit ticket, you know, endorsed the check, Alan Bilkey on the back, filled out a deposit ticket, took it to the window and put it in his account, even though it's a large check. And Mr. Mangio knew once he gave Bilkey the check, Bilkey was going to do something with the check and that money would be used for some purpose, correct? That's right. The purpose was to facilitate the sale of the farm. At that point there was no contract, real estate contract, in existence. There was no written contract. They had an oil agreement. And that was the point I was about to drive, is that the trial court accepted the invitation of Black Hawk to say that somehow Mangio was negligent or didn't use due care here. That's not the legal standard. I mean, if you look at the Lotta case and the restatement, Section 157, upon which it relies, Mangio actually had to have engaged in active bad faith, in my view, under that case and that restatement section, in order to be precluded from pursuing the unjust enrichment claim or otherwise being guilty of unclean hands. I don't think it's correct. He wasn't acting in bad faith. Mr. Mangio relied on his friend. He got duped by Bilkey. And, Your Honor, I don't believe there's any evidence that they were friends. He was a guy. They were not friends. In any event, I don't think that... So give us, summarize your point exactly. The check was given, you're saying when the check was delivered to the bank, it was incumbent upon the bank to investigate further. And when they did not, they became unjustly enriched or what? How do you tie this into the result? Two ways. When the bank did not do the further investigation, it did not, therefore, take the check in good faith. It was, therefore, not in holder in due course. When the bank lost its holder in due course status, two things happened. The first thing is this idea that it's an absolute defense to the unjust enrichment claim falls away. And then we get down to the argument about who has a better right in justice and equity to the check. And I would argue that Marty does. The second thing about the loss of the holder in due course status is that it opens up the rescission counts, which the trial court dismissed with prejudice. If the bank is not a holder in due course, then Maggio's UCC claims to seek rescission of the negotiation of that instrument, follow the check until it gets to a holder in due course. If the bank is not a holder in due course, it's subject to those defenses. But the trial court didn't even try those counts. The trial court threw those out on a motion. So in essence, you're saying the bank is not a holder in due course because the attendant circumstances gave rise to a suspicion and therefore they were not acting in good faith. They plunged it having cash to check without checking. That is correct. Is that in essence your position? It is, and I would add one thing to that, that the bank did not pay value, which is also an element of the holder in due course requirement for the reasons I've given already that I think it's illusory. Based on those points, I would respectfully request the court to reverse the trial court and to direct the court to enter judgment in Marty's favor on the unjust enrichment claim and the rescission counts. All right. Thank you very much, counsel. You'll have an opportunity to address the court again in rebuttal. Counsel for Miepoli. Thank you, Your Honor. May it please the court. My name is Matthew Heverin here on behalf of Blackhawk State Bank. Ultimately, I think that counsel is right. One of the most crucial issues to be dealt with is the holder in due course rule because if indeed, as the trial court found, Blackhawk State Bank is a holder in due course, then that defeats all of the claims that have been brought by Miepoli. So I take it you're up here to tell us why they were. That's correct, Your Honor. Why were they? Why Blackhawk was a holder in due course? Well, ultimately, as the trial court found to be a holder in due course, you have to take a check for value and in good faith and without notice of any claims or offenses. I don't believe that there's any dispute as to the fact that the check was taken for value. When the check came in, the account of Mr. Bilkey was credited by $425,000. So that value was definitely given. With respect to any notice of any claims, which may or may not have existed, basically there was no conversation in the evidence which came out of trial was that Blackhawk would never have any conversation with Mr. Maggio until a month after the check was negotiated. At that point in time, Mr. Maggio asked the bank to release its mortgage and the bank had refused. I don't think the opposing counsel is disputing that. He's hanging his head on the nature, the surrounding circumstances, the notation on the check itself. What does it say? Correct. Specifically, counsel was correct when he said the check said payment on farm less $425,000 BAL, which presumably means balance of $400,000 due. Doesn't that on its face give notice of a claim? Absolutely not. That notation without any further context doesn't give any indication whatsoever as to what that means. We don't know what the farm is. We don't know what the agreement was between Mr. Bilkey and Mr. Maggio. There was no additional context whatsoever. He said that didn't Bilkey represent Larson? This was a friend trying to help him out. You're correct, Your Honor. But doesn't this check then allude to there's a transaction between Bilkey and Mr. Maggio? How is he simply helping him out? There's another transaction going on underlying this check, right? Well, we don't really know exactly what the transaction was or what the agreement was between the two. I think that But it raises a suspicion on its face, doesn't it, that something is going on behind the scenes? Well, I don't think so. I think the bank went above and beyond at that point where when this check came in, Mr. Larson contacted Mr. Bilkey and said, well, where did this check come from? What is this for? I don't think the bank had any obligation to do that. I disagree with counsel when he says that New Randolph required it. But at that point in time when Mr. Bilkey told him, you know, look, this is a friend. He's helping me out of a bad situation. The bank had no obligation to go any further. You're saying the bank fulfilled its obligation. Your position is because they did make the call. Correct. They just didn't ignore everything. And apparently you're saying Bilkey gave them a plausible explanation? Well, I don't think it even had an obligation to do that. But the mere fact that it did that, I think, shows that it went above and beyond what it was required to do. Ultimately, I think even if that call had not been made, the bank would still, should have been a holder in due course based upon the facts of the situation. Because the only evidence which would show that they had actual knowledge that there was a problem with this check is just in that memo line in the check. And that in and of itself is simply not enough. A memo line could never be enough? Well, I suppose it could have been if the memo line had said, if it had detailed that the expectation of this check that Blackhawk State Bank was going to release its mortgage in exchange for this check. Well, then, to me, certainly then it could have been enough. But that's not the facts that we have. Well, let me ask you this. He cited a case, okay, that he believes is on point and is controlling the results here. How do you distinguish this case from the case that he cited? The New Randolph case that you're speaking about? Well, New Randolph, I think, was much different than the case that we have here. As Your Honor pointed out, there was a series of checks that was involved there. And the main check at issue in that case, later on, after the prior two were presented, the name of the payee was spelled wrong. So that was ultimately a problem. There was also a discrepancy in the amount that was listed in that check. We didn't have that issue here. There's no issue with respect to this check in particular. It was a proper check. It was payable to the person it was intended to be payable to. The name of the check was correct. The amount has not been disputed. The only issue is the payee line. And, again, that in itself I don't believe is enough. Interestingly, the New Randolph case specifically held that in order to defeat a holder in due course status, the bank would have had to have actual knowledge of the defenses or sufficient facts to basically indicate that they are deliberately desiring to evade any knowledge of any defenses. There's simply not that in this case. The trial court believed Larson's testimony that that was not what the bank was doing, correct? That's correct, Your Honor. Ultimately, Mr. Larson testified that he didn't have any contact with Mr. Maggio. He didn't have any idea of what this transaction was or what it was for. And the trial court found his testimony to be consistent and credible. And I believe that goes a long way. So, ultimately, with respect to the holder in due course status, I think the bank was a holder in due course, and that defeats all of the claims that exist here. I think there are also several other reasons why the trial court properly found that the unjust enrichment cause of action, as well as the other cause of actions, should not survive. One of the other things the trial court relied upon is unclean hands, and that was used to defeat all of the claims as well. Now, ultimately, what we have here is Mr. Maggio writing a $425,000 check without so much as talking to an attorney, without hiring a title company, and without even so much as a written contract. So what doctrine of defense does that fall under? Unclean hands, I think. Why would that be unclean hands? Well, I think that, ultimately, all of the causes of action are equitable ones in nature. And as equitable claims, I think you have to look at the conduct of both parties as to who was in the better position to avoid the loss. And I think, ultimately, had Mr. Maggio done any of those things, that the loss could have been avoided. This would have been a loss that he could have avoided, as opposed to their argument that the bank could have avoided this loss had it been able to decipher whatever this memo on the check is. That simply, in itself, is not enough. Could you address the issue of the sanction that was imposed by the trial court? Certainly. With respect to the sanction, ultimately, the reason that sanction was put into place was because we had asked in interrogatories and requests to produce, as well as directly in Mr. Maggio's deposition on numerous occasions, is there any settlement agreement that exists between Mr. Bilkey and Mr. Maggio. And on every one of those occasions, we were told flat out no. And three days prior to trial, months and months after his deposition and after these discovery requests had gone out, we were presented with a settlement agreement right before trial. Ultimately, we filed a motion for sanctions at that point in time. I think that this goes well beyond the ordinary discovery issue where someone raises perhaps a frivolous objection. In this particular instance, I think that... Absolutely. And because of that, I think that sanctions probably weren't near enough. I mean, ultimately, it amounts to perjury. But the sanctions that were imposed here, we asked for about $4,600 in attorney's fees and the trial court awarded $2,000. And I think ultimately, given the conduct here, $2,000 is certainly justified and perhaps more would have also been justified. Well, you didn't file a cross-appeal, so if we approve, it's fixed at $2,000, right? That's correct, Your Honor. Can you briefly allude to him reviewing the record, reviewing the briefs of the parties? I think his position is, well, what was the prejudice to the bank? So can you address that? Well, with respect to the prejudice, first of all, I don't know that the prejudice really comes into play all that much. I mean, ultimately, if the standard is what prejudice is there, then we would be leaving parties on their own to decide what should and should not be produced. And they can say, well, simply, it's not relevant. You don't really need it, so I'm not going to produce it. That's not the standard. That said, had we had that document in advance, certainly we could have explored a lot more into what the agreement was. We could have filed a motion for summary judgment. What would the end result have been of that? I'm not sure. But ultimately, I'm not sure that the prejudice really plays a part. We don't want to let parties make their own decision as to what and what should not should be turned over when you have a document which is admittedly relevant. Well, in addition to the failure to turn over the document, Bilkey also was never deposed, correct? That's correct. We tried to depose him, but ultimately it became clear very quickly that his medical issues were such that he was not going to be able to competently testify. So his deposition was never completed, nor did he testify at trial. And along those lines, for those reasons, I think the trial court properly found that Mr. Bilkey's testimony through the affidavit simply was not credible and should not be given any weight because he couldn't have been there to support it whatsoever. So ultimately, I think that leaves us with the rescission claims themselves. And I think the holder and the course, as well as the actions of Maggio, already defeat those claims. But I think there's other issues as well that defeat those claims. In order to plea rescission and negotiation based on mutual agreement, you have to plead and prove both parties are mistaken about the material features of the contract, that the matters of such consequence that enforcement of the contract would be unconscionable, that the plaintiff's mistake occurred despite reasonable care, and that the other party can be placed in status quo. Here, ultimately, if there was any mistaken belief as to the terms of the contract, that couldn't have been with Blackhawk State Bank. Blackhawk State Bank wasn't even aware of this contract until a month after the check was negotiated. So if there was a mistake, it would have been between Maggio and Bilkey. Might Mr. Maggio have a claim against Mr. Bilkey? Well, probably. But just because even if they were mistaken between the two of them, that doesn't give them the right to go after a third party who had no knowledge of what the transaction was that was going on and ask that third party to pay them back for whatever was going on. Second, Mr. Maggio could never be able to prove that the mistake that occurred, what had occurred despite his exercise of reasonable care. As I previously mentioned, there's no written contract here. There was no title search that had occurred. And Mr. Maggio never hired an attorney. Had he done those things, the result may have been a little bit different. Finally, with respect to the rescission of negotiation based on fraud, there there's got to be a representation of a statement of material fact made to induce the other party to act. Again, Blackhawk State Bank didn't make any statement here. There wasn't any communication with Mr. Maggio until a month after that check was negotiated. So basically what they're asserting is that because of some misrepresentation that Mr. Bilkey may or may not have made. That went to the bank. And you're saying the bank had no negotiations with Mr. Maggio before he even talked to him until a month later. Exactly. And for that reason, ultimately the bank can't be held liable for something that they had nothing to do with. Ultimately, as well, you have the holder of due course issue, which I believe, again, is the way it's Blackhawk State Bank from liability. Ultimately, Your Honor, I believe that addresses everything that I have to raise. Unless Your Honors have anything else, I'll briefly conclude. Thank you very much, Counsel. Thank you, Your Honor. For the reasons previously stated, I believe the rulings of the trial court should be affirmed. Thank you, Your Honor. Thank you. Mr. Manning, you may respond to me both. I only have a few points to make. The idea that the banker didn't know what the farm was that's referenced on the check or what the transaction was referencing is belied by the record. This banker knew everything Alan Bilkey had. He watched him closely, weekly. The record shows that Bilkey was required to give detailed financial information to the bank and did so shortly before this occurrence. Bilkey's assets were completely cross-collateralized with everything the bank had. In the last financial submittals that the bank got from Bilkey, there was a picture of this farm, specifically a diagram of it with a discussion about it. Later in the year before that, Bilkey was allowed to sell off a portion of the farm to another entity that the banker was involved in. These are all things in the record. This banker knew exactly what Bilkey owned and what Bilkey could sell. And the banker also knew that Bilkey couldn't sell a farm for $825,000 without answering to the bank. So the idea that this was some kind of unknown or a piece of asset or something that the bank didn't know about is just flat out. I don't think that's the argument that they're making though. The argument is that Larson called and he checked into the question that was raised by the plain language on the check and he was satisfied. And the trial court took that testimony as credible. The problem is that he called the wrong guy. He called the culprit. He called Alan Bilkey. That's not reasonable. Why would you call the guy who's giving you the suspicious instrument? It doesn't make sense. Was there any evidence offered that Bilkey had, no pun intended, built the bank in the past? No. The only evidence that goes down that path is the fact that he sold an RV out of trust. Well, yeah, but he also sold a $425,000 RV out of trust, which means he sold it, took the proceeds, and didn't pay the banks because the bank had a floor plan lien on that RV. And there were several others that were missing in the record. You'll see some e-mail traffic right at this time between the bank internally. I don't have the page, but the bankers were talking about the fact that Bilkey was actively now moving assets around and doing things and not paying the bank. So did he build the bank? He was kind of doing it at that time, I would say. But the real point I'm driving on that is that, look, the banker knew what Bilkey had and he knew where Bilkey was and he should have called Marty, not Alan Bilkey, when he saw that check. The other thing about that is the banker wanted to counsel argued that you could just look at the check and go ahead and cash it and apply it to Bilkey's account and everything's okay. I just don't think that squares with the case law. The memo on the check alone, that had enough suspicion about it that the banker then called Bilkey. That's submission, really, in my view. So the banker sees that and he says, what is this? So then he calls Bilkey and he gets this cock and bull story about Maggio being an old friend. You can't just look at the memo on the check and the banker didn't. But he went part of the way. I don't disagree that calling Alan was the wrong thing to do. I agree he should have called Alan. And he got Alan's story. And he was satisfied with Alan's story. Yeah, but he shouldn't have been. He couldn't have been. A reasonable banker couldn't have been saying that. So your theory is that no matter what Alan said, he had to discount it and call Maggio? You know, I don't know about that. That's all speculation. Well, it's not speculation about what the evidence that the trial court accepted as to what Bilkey said. The trial court found that Bilkey told Larson Maggio is an old family friend and he was working out. When you compare that statement, the circumstances of Bilkey's distress and his conduct at the time, to what Bilkey, you know, to the memo on the check. You put all that together, you say, come on, banker, you should have called Marty. A reasonable person would have said, I'm going to call the maker of this check and find out. In fact, the phone number was on the check. So I just don't buy the idea that this banker could put his head in the sand, take the money and apply it to Bilkey's $7 million debt, and just put Marty, hang Marty to dry. I just don't see it as a reasonable thing to do. In terms of this rescission claim, again, we go back to holder in due course. If the bank is not a holder in due course, and I don't think they are, then it doesn't have that absolute defense to the rescission claims. If you just look at the fraud claim and accept what the trial court found, the trial court found essentially that Bilkey lied to Marty, and maybe to the bank too, but basically Bilkey was the bad guy. He tricked Marty out of $425,000. Well, if the bank is not a holder in due course, then we've not only pled, but we've proven the rescission count based on fraud, because it's Allen's fraud that counts, it's not the bank's fraud. The defense follows the check. Marty can rely on Allen's fraud to pull his check back from the bank if the bank is not a holder in due course. So with that, I thank you for your time. Can you just address one point? Yes. I asked about the sanctions earlier. Is prejudice required in order to impose sanctions? Probably not. I would say that it would be more likely relevant to the sanction imposed. It's a factor to consider by the trial court, and it's a piece of discussion, isn't it? It is. The main problem I have with that agreement is that it's never been demonstrated why it has anything to do with this. I was a candidate. When we found out about it, we delivered it up, and Marty should have done a better job of being diligent about disclosing things. We've said that, and we've admitted it. He has a problem with diligence overall, doesn't he? I don't know about that, but in this particular instance, he does. He's informal in that regard. But the trial court used the failure to disclose that agreement as a substantive reason in addition to the sanction, and I think that's improper. Again, as I've said in the brief and to the trial court, sure, was it subject to discovery? Yeah. But did it impact the merit to know? And with that, I thank you for your time and request that you reverse the trial court. Thank you. I'd like to thank both counsel here this morning for the quality of their arguments. The matter will be taken under advisement, and a written disposition will issue in due course. We will be adjourned for about 15 minutes until the next case. Thank you.